E. JOSEPH CONNAUGHTON (SBN 166765)
jconnaughton@paulplevin.com
MATTHEW R. JEDRESKI (SBN 274251)
mjedreski@paulplevin.com
**PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP**
101 West Broadway, Ninth Floor
San Diego, California 92101-8285
Telephone: 619-237-5200
Facsimile: 619-615-0700

Attorneys for Defendant and Counter-Claimant ILLUMINA, INC.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INTERLABSERIVICE, OOO, a Russian Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>ILLUMINA, INC., a Delaware Corporation; ILLUMINA NETHERLANDS, BV, a Netherlands Limited Liability Company; NICK BATES, an individual; DOES 1 through 10,<br><br>Defendants.<br><br>AND RELATED CROSS-ACTIONS | Case No. 15-cv-02171-AJB-KSC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ILLUMINA, INC.'S MOTION FOR POSTING OF A BOND PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1030**<br><br>Date: TBD<br>Time: TBD<br><br>Judge: Anthony J. Battaglia<br>Courtroom: 3-B<br>Magistrate Judge: Karen S. Crawford<br>Courtroom: Suite 1010<br>Trial Date: Not Set |

# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF ARGUMENT .................................... 1

II. FACTS ........................................................................................................ 2

A. ILS becomes Illumina's Exclusive Distributor in the Russian Federation and Associated Territories. ........................................................................ 2

B. Warranty and Service Obligations under the Distributors Agreement. .......... 3

C. ILS Requests a Change in Warranty Structure Due to Russian Law. ............ 4

D. In 2014, ILS's Sales and Service Quality Plummet......................................... 5

E. Illumina Allows the Distributors Agreement to Expire. ................................. 6

F. Illumina Requests ILS Transition Customers to Its New Distributor, but ILS Refuses. ........................................................................................................ 7

III. ILS SHOULD POST A BOND FOR COSTS ................................................... 8

A. ILS Resides in Russia....................................................................................... 9

B. There Is a "Reasonable Possibility" Illumina Will Prevail.............................. 9

1. Illumina Is Reasonably Likely to Defeat ILS's Breach of Contract Claim ........................................................................................ 10

2. Illumina Has a Reasonable Possibility of Defeating the Common Counts Claim. ...................................................................................... 15

C. A Security in the Amount of $77,517.50 Is Appropriate.............................. 16

IV. CONCLUSION .......................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AF Holdings LLC v. Navasca*,
2013 WL 450383 (N.D. Cal. Feb. 5, 2013) .......... 9, 16

*Berger v. Home Depot U.S.A., Inc.*,
476 F.Supp.2d 1174 (C.D. Cal. 2007) .......... 11

*Buschman v. Anesthesia Business Consultants LLC*,
42 F.Supp.3d 1244, 1250 (N.D. Cal. 2014) .......... 10

*Gabriel Techs. Corp. v. Qualcomm Inc.*,
2010 WL 3718848 (S.D. Cal. Sept. 20, 2010) .......... 17

*Kourtis v. Cameron*,
358 F. App'x 863 (9th Cir. 2009) .......... 8, 9, 16

*Pittman ex rel. L.P. v. Avish P'ship*,
525 F. App'x 591 (9th Cir. 2013) .......... 1, 8, 16

**California Cases**

*Baltayan v. Estate of Getemyan*,
90 Cal.App.4th 1427 (2001) .......... 9

*Burch v. Premier Homes, LLC*,
199 Cal.App.4th 730 (2011) .......... 13

*CDF Firefighters v. Maldonado*,
158 Cal.App.4th 1226 (2008) .......... 10

*Clark v. Dulien Steel Products*,
54 Cal.App.2d 92 (1942) .......... 15

*Employers Reinsurance Co. v. Superior Court*,
161 Cal.App.4th 906 (2008) .......... 14

*Esbensen v. Userware Internat., Inc.*,
11 Cal.App.4th 631 (1992) .......... 12

*Farmers Ins. Exchange v. Zerin*,
53 Cal.App.4th 445 (1997) ... 16

*McBride v. Boughton*,
123 Cal.App.4th 379 (2004) ... 15

*Spellman v. Dixon*,
256 Cal.App.2d 1 (1967) ... 15

*Yao v. Superior Court*,
104 Cal.App.4th 327 (2002) ... 8

**California Statutes**

Cal. Code Civ. Proc.
section 1030 ... 8, 9
section 1030(b) ... 16
section 1856(a) ... 12

Cal. Com. Code
section 1303 ... 14

**Other Authorities**

Local Rule 54.1(b)(1) ... 16

Local Rule 54.1(b)(2) ... 16

Local Rule 54.1(b)(3)(a) ... 16

Local Rule 54.1(b)(3)(b)-(c) ... 16

Local Rule 54.1(b)(3)(g) ... 16

Local Rule 54.1(b)(4) ... 16

Local Rule 54.1(b)(6) ... 16

Local Rule 65.1.2(a) ... 1, 8

# I.

# INTRODUCTION AND SUMMARY OF ARGUMENT

As a matter of law, litigants that avail themselves of our court systems but have nothing to lose – for example, no property in California upon which costs might someday be levied – may be compelled to post an undertaking. *Pittman ex rel. L.P. v. Avish P'ship*, 525 F. App'x 591, 592 (9th Cir. 2013); United States District Court Southern District of California Local Rules, Rule 65.1.2(a). All a defendant need show to require such an undertaking is that the plaintiff is a foreign domiciliary and that the defendant has a "reasonable possibility" of prevailing on the merits.

Here, plaintiff/cross-defendant Interlabservices, OOO ("ILS") is perhaps the most judgment-proof litigant in any California state or federal court. It is not registered in California, or anywhere in the United States. It employs no one in California, or anywhere in the United States. It owns no California or United States property. It pays no California or United States taxes. Its ownership is currently unclear and it is domiciled in the Russian Federation, a jurisdiction that does not recognize American judgments.

Because ILS's claims are meritless, and Illumina's costs are likely to be substantial, a bond should be required.

* * * *

This is a breach of contract action. Illumina is a San Diego-based company specializing in genomics – the study of genetic variation. Illumina sells its industry-leading genetic sequencing machines and products across the globe. ILS contracted with Illumina from April 2011 until December 2014 to sell and service Illumina's products in the Russian Federation and nearby countries. In exchange, ILS was granted territorial exclusivity, was permitted to order Illumina products at a 15% discount off list price, and could charge customers 20% over list price.

/ / /

ILS now claims that Illumina must reimburse it for the cost of replacement parts for Illumina devices. Illumina has, at the very least, a "reasonable possibility" of defeating ILS's claims because the parties specifically agreed that ILS would pay for replacement part orders.

This case is clear-cut, and ILS is judgment-proof. Illumina thus moves for an order that ILS post an undertaking in the amount of $77,517.50, which represents the minimum amount of recoverable costs Illumina is likely to incur defending ILS's sprawling international lawsuit.

## II.

## FACTS

### A. ILS becomes Illumina's Exclusive Distributor in the Russian Federation and Associated Territories.

Illumina and ILS began working together in April 2011, when ILS became the exclusive distributor of Illumina's genomic sequencing products and services in Russia and associated territories. Declaration of Stephane Garcia ¶ 4. The basic framework of the deal was simple: ILS would advertise, market, promote, sell, distribute, and service Illumina products within the Russian territories, all at its own expense. Garcia Decl. Ex. A-7 (§ 2). In exchange, Illumina would sell products to ILS at a 15% discount and permit ILS to resell those products to Russian customers at a price up to 20% over Illumina's list price, for a 35% profit. *Id*. at Ex. A-48.

The parties entered into an "International Distributors Agreement" in April 2011, detailing their various rights and obligations. *Id*. at Ex. A. It was a one-year agreement that would terminate after 12 months (or could be terminated earlier by either party with certain conditions). *Id.* at Ex. A-28 (§ 13.1). It provided that:

- ILS would "be solely responsible for all its costs and expenses related to advertising, marketing, promoting, and distributing" Illumina products; *Id*. at Ex. A-7 (§ 3.1);

/ / /

- ILS would obtain all necessary registrations and approvals from governmental agencies to sell and distribute Illumina products; *Id*. at Ex. A-11 (§ 3.15);
- ILS would obtain all permits, approvals, and licenses for the import of Illumina products at its own expense; *Id*. at Ex. A-11 (§ 3.16);
- ILS had to provide an annual sales forecast of Illumina products and achieve 80% of the projected annual sales target (with the failure to do so constituting grounds for terminating the agreement); *Id*. at Ex. A-12 (§ 3.18);
- Illumina would train ILS staff on technical aspects of installing and maintaining Illumina devices; *Id*. at Ex. A-49; and
- ILS would maintain at least five employees devoted strictly to supporting the Illumina business (in particular, a Sales Manager, a Sales Executive "with genomics background," a Field Application Specialist "with strong wet lab experience in genomics," a Field Service Engineer "with experience in optics and electronics," and a Sales Operations and Logistics Administrator). *Ibid*.

**B. Warranty and Service Obligations under the Distributors Agreement.**

Particularly relevant to this lawsuit were each party's warranty obligations. Illumina had a standard warranty for its devices that made replacement parts and repairs free-of-charge to customers for one year after purchase. Garcia Decl. ¶ 4, Ex. B. The Distributors Agreement obligated ILS "to provide warranty and maintenance (*i.e*. support services)" to customers in Russia and associated territories, and to "provide any such support or assistance [to customers] in accordance with Illumina's standard warranty program." *Id.* at Ex. A-7 (§ 2), Ex. A-27 (§ 11.2). ILS – as the customer-facing party – would receive warranty requests directly from customers, would order replacement parts free-of-charge from Illumina, and would provide those parts and warranty services (also free-of-charge)

to the customers. Garcia Decl.¶ 7.

**C. ILS Requests a Change in Warranty Structure Due to Russian Law.**

It soon became apparent that Russian law created unforeseen issues. In particular, when ILS began importing replacement parts, it discovered the process for importing free (but valuable) items was costly and time-consuming. Russian law required the importer to declare and describe the value of the imports and to pay customs duties and various taxes, even though the goods had no independent value and were provided free-of-charge. Garcia Decl. ¶ 8; Declaration of Andrey Lomonosov ¶ 4. This process also took up to six to nine months to complete. Lomonosov Decl. ¶ 4.

Under the parties' agreement, although Illumina was obligated to provide warranty parts free-of-charge, ILS was required to pay any import costs and taxes. To avoid delay and import costs, ILS decided to order and pay for replacement parts, or to simply delay providing warranty services to some customers. Garcia Decl. ¶ 8; Lomonosov Decl. ¶ 5.

In December 2012 – as the parties began discussing a continuation of the Distributors Agreement[1] – ILS told Illumina that it had spent $30,000 - $40,000 ordering replacement parts, and had delayed ordering $80,000 more. Garcia Decl. ¶ 8. Following negotiations, ILS agreed it would continue to buy replacement parts (rather than order them free-of-charge) and, in exchange, Illumina would increase ILS's discount off Illumina's list prices by 5% (from 15% to 20%). *Id*. at ¶ 9, Ex. D-89 (additional discount 5% granted "to cover the service orders (parts and reagents) during the first year of warranty"); Lomonosov Decl. ¶ 6. ILS confirmed this agreement in an email. Garcia Decl. Ex. E-90. Given the $3.5 million in projected 2013 sales, this additional 5% discount would provide ILS with an

[1] The parties signed a supplemental agreement in May 2012 that extended the Distributors Agreement until the end of 2012. Garcia Decl. Ex. C.

estimated $175,000 – more than enough to compensate ILS for these warranty orders. *Id*. at ¶ 9, Ex. D-89; Lomonosov Decl. ¶ 8. It was also, undisputedly, an agreement that ILS would no longer receive free replacement parts and services under the warranty program. *Ibid*.

The parties' agreement was then committed to a signed writing. Garcia Decl. ¶ 13, Ex. F-92 (requesting permission to add 5% discount to 2013 Distributors Agreement to cover warranty costs, Ex. G-136 (incorporating additional 5% discount);Lomonosov Decl. ¶ 7.

This arrangement was never amended. Garcia Decl. ¶ 14; Declaration of Nick Bates ¶ 15. Indeed, in 2013, the incremental revenue ILS earned from the additional 5% discount vastly exceeded the amount it spent on warranty parts. Lomonosov Decl.¶ 8. From December 2012 when the agreement was made until the end of the parties' relationship in December 2014, ILS continued to receive this extra 5% discount, and never requested Illumina reimburse it for any warranty services or replacement parts because those costs were now "built in" to the agreement. Garcia Decl. ¶ 15; Lomonosov Decl. ¶ 7.

**D. In 2014, ILS's Sales and Service Quality Plummet.**

The parties renewed their one-year Distributors Agreement for 2014 with no material changes. Bates Decl. Ex. H. It would expire by its own terms on December 31, 2014. *Id*. at Ex. H-26 (§ 13.1).

Although Illumina had never been perfectly satisfied with ILS's performance, the relationship dramatically deteriorated by mid-2014. *Id*. at ¶ 5.

First, Illumina began receiving reports from customers that ILS's service was slow or non-existent. *Id*. at ¶ 6. This included complaints from customers that ILS was taking up to six months to deliver routine components; that it was taking up to two weeks to provide a sales quote; that it was taking four weeks or longer to approve and process orders; and that ILS was not providing customers with replacement parts. *Ibid*.

In addition, a half-dozen key ILS personnel, who had been specially trained to support Illumina's business, left or were planning to leave ILS in 2014. *Id*. at ¶ 7. Illumina also learned that a large percentage of ILS's workforce was looking to leave the company. *Ibid*.

By July 2014, sales in ILS's territory were four times lower for 2014 than they had been in 2013. *Id*. at ¶ 8. In August 2014, ILS projected to finish 2014 with $3.8 - $4.0M in sales (less than 68% of the 2014 projected annual sales forecast of $6.0M). *Ibid.; see* Garcia Decl. Ex. A-12 (§ 3.18) (requiring ILS to make at least 80% of its annual projected sales).

**E. Illumina Allows the Distributors Agreement to Expire.**

As a result of these developments, Illumina proceeded on dual tracks during the second half of 2014 – supporting and trying to regain confidence in ILS, while also looking for an alternate distribution channel should ILS not cure its deficiencies. Bates Decl. ¶ 9. Illumina ultimately began negotiations with KhimExpert, an ILS competitor where several Illumina-trained ILS employees had joined following their departure from ILS. *Ibid*.

On November 27, 2014 – soon after Illumina had made the decision to allow the Distributors Agreement to expire, but before informing ILS of this decision – an Illumina employee named Dr. Florian Graedler mistakenly sent an email to an ILS email address with information about the new distributor. *Id*. at ¶ 10, Ex. I-56. That same day, the Chairman of ILS's Board of Directors wrote the following response [*sic* throughout]:

> Thank u Florian for the informing us about new distributor. I really appreciate your help. As for your hints that ILS is working badly, let's see how the new distributor will work…. I am sure that Illumina sooner or later stop doing in a wrong way in Russia. Please, don't forget that CRIE is an important customer for Illumina. Just want to remind u about HiSeq and MySeq. Hope Illumina will continue providing us with reagents and spareparts or...

*Id*. at Ex. J-57.

/ / /

Illumina confirmed its decision not to renew the Distributors Agreement in a phone call to ILS the next day. *Id*. at ¶ 12.

**F. Illumina Requests ILS Transition Customers to Its New Distributor, but ILS Refuses.**

After informing ILS that it would allow the 2014 Distributors Agreement to expire, Illumina met with ILS in Moscow and requested a list of customers who might have ongoing warranty or service issues, as was permitted under the agreement. *Id*. at ¶ 12, Ex. K-59.. Illumina planned to transition these customers to its new distributor, so that ILS would not have to pay for any future warranty replacements, even though ILS was contractually bound to do so. *Id*. at ¶ 12. In an email response, ILS noted its own concerns about ongoing warranty obligations to customers who had bought Illumina devices from ILS, while **specifically confirming** that it was obligated to pay for Illumina warranty orders in exchange for the additional 5% discount:

> "Here two questions rise:
>
> -How to buy spares / reagents without any contract
>
> -How to compensate these expenses next year because we will no longer have any shipments as well as no more 5% discount"

*Id*. at Ex. L-61. Illumina again requested ILS provide it with information on all customers who had purchased Illumina devices that were still under warranty. *Id*. at ¶ 13, Ex. L-61.

ILS immediately ceased all communication on this topic, and instead began disparaging Illumina's new distributor and used Illumina's previously-granted power of attorney (which, through inadvertence, had not been withdrawn) to cancel registration of Illumina's products in Russia. *Id*. at ¶ 14.

Incredibly, ILS then sued Illumina in California, claiming – for the first time – that Illumina was obligated to reimburse it for the cost of warranty replacement part orders, despite the parties' express contrary agreement. After a removal and

motion to dismiss, ILS now has two claims against Illumina – for Breach of Contract and for "Common Counts," both of which allege Illumina must reimburse ILS for the warranty replacement parts ILS ordered from 2011 through 2014.

## III.

## ILS SHOULD POST A BOND FOR COSTS

This Court has "inherent power to require plaintiffs to post security for costs." *Pittman ex rel. L.P. v. Avish P'ship*, 525 F. App'x 591, 592 (9th Cir. 2013); *see also* United States District Court Southern District of California Local Rule 65.1.2(a) ["A judge may, upon demand of any party, where authorized by law and for good cause shown, require any party to furnish security for costs which may be awarded against such party in an amount and on such terms as are appropriate."]. Such a requirement "is especially common when a non-resident party is involved." *Pittman*, 525 F. App'x at 592 (quoting 10 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2nd § 2671).

Federal courts in California are specifically authorized to order the posting of a security pursuant to California Code of Civil Procedure section 1030. *Pittman*, 525 F. App'x at 593; *Kourtis v. Cameron*, 358 F. App'x 863, 866 (9th Cir. 2009). Under section 1030, a court may order a plaintiff to post a security when a defendant shows: (1) the plaintiff resides out of state; and (2) there is a "reasonable possibility" that the defendant will prevail on the merits. Cal. Code Civ. Proc. § 1030; *Pittman*, 525 F. App'x at 593. The purpose of this mechanism "is to enable a California resident sued by an out-of-state resident 'to secure costs in light of the difficulty of enforcing a judgment for costs against a person who is not within the court's jurisdiction.'" *Yao v. Superior Court*, 104 Cal.App.4th 327, 331 (2002).

An order that ILS post a security bond is appropriate here, where ILS – as a resident of Russia – would be immune from any California judgment,[2] and where

---

[2] The enforcement of foreign decisions in Russia is governed by Article 241.1 of the

Illumina's strong defenses to ILS's claims give it at least a "reasonable possibility" of prevailing.

**A. ILS Resides in Russia.**

ILS, according to its own pleadings, is a Russian limited liability company. *See* First Amended Complaint at 1:21-23. Accordingly, ILS resides outside of California (and outside the United States), thus the first prong of section 1030 is satisfied. *Kourtis*, 358 F. App'x at 866.

**B. There Is a "Reasonable Possibility" Illumina Will Prevail.**

A "reasonable possibility" of prevailing on the merits is a "relatively low standard." *AF Holdings LLC v. Navasca*, 2013 WL 450383, at *1 (N.D. Cal. Feb. 5, 2013); *Baltayan v. Estate of Getemyan*, 90 Cal.App.4th 1427, 1432 (2001) (a defendant is "not required to show that there [is] no possibility that [the plaintiff] could win at trial, but only that it [is] reasonably possible that [the defendant will] win.").

ILS's two causes of action (Breach of Contract and "Common Counts") allege the same thing – that Illumina failed to reimburse ILS for service and replacement parts. Yet the evidence demonstrates that: (1) per the Distributors Agreement, ILS was supposed to order the replacement parts free-of-charge and

---

Arbitrazh Procedural Code of the Russian Federation (Federal law No. 95-FZ, dated 24 July 2002). According to this rule:

> "The decisions of foreign states' courts in disputes and other cases steaming from business and other economic activities (foreign courts), the decisions of internal arbitral tribunals and international commercial arbitration tribunals issued on the territory of foreign states in disputes and other cases steaming from business and other economic activities (foreign arbitral awards) are recognized and enforced in the Russian Federation by the arbitrazh courts if recognition and enforcement of such decisions is provided for by the international treaty of the Russian Federation or by Federal law."

There is no international treaty between the United States and the Russian Federation that would provide for the enforcement of state court decisions.

bear all the associated import taxes; (2) due to unforeseen issues of Russian law, ILS decided to simply pay for replacement part orders; (3) after ILS complained to Illumina in late 2012 about the cost of replacement part orders, the parties agreed to a further 5% discount off Illumina list prices to compensate ILS for its past and future payment for warranty parts; (4) the parties incorporated this term into the 2013 and 2014 Distribution Agreements; (5) ILS subsequently confirmed multiple times in writing that it was responsible for replacement part order costs in exchange for the extra 5% discount; and (6) ILS never asked for reimbursement for these expenses until filing this litigation.

Illumina therefore has *at least* a reasonable possibility of prevailing on these claims.

**1. Illumina Is Reasonably Likely to Defeat ILS's Breach of Contract Claim.**

The elements for a breach of contract action under California law are: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff as a result of the breach. *See CDF Firefighters v. Maldonado*, 158 Cal.App.4th 1226, 1239 (2008); *Buschman v. Anesthesia Business Consultants LLC*, 42 F.Supp.3d 1244, 1250 (N.D. Cal. 2014).

**a. ILS Cannot Point to any Contract Terms Breached by Illumina.**

ILS alleges the 2011, 2012, 2013, and 2014 Distributors Agreements require Illumina "to provide and or compensate for parts, maintenance and compensate ILS for warranty services" for customers. First Amended Complaint at 4:24-5:3. ILS does not cite to any specific provision of the Distributors Agreements for this alleged obligation.

The Distributors Agreement actually required ILS to import these parts free-of-charge, and contractually obligated ILS to pay for any taxes or duties associated with *all* importations. Garcia Decl. Ex. A-11 (§ 3.16). It was ILS that chose instead

to order and pay for replacement parts because of the high cost and lengthy process associated with free-of-charge imports. Nothing in the Distributors Agreement required Illumina to reimburse ILS for such orders, or to permit ILS to shift the cost allocation agreed to in the Distributors Agreement. Because ILS cannot point to any specific contractual term that Illumina has breached, ILS cannot succeed on its breach of contract claim. *See Berger v. Home Depot U.S.A., Inc*., 476 F.Supp.2d 1174, 1176 (C.D. Cal. 2007).

**b. ILS Specifically Agreed to Pay for Ordering of Warranty Parts.**

It is indisputable that ILS agreed in 2013 to pay for the costs of ordering replacement parts in exchange for an extra 5% discount on all its purchases from Illumina. This agreement is evident from:

- the additional 5% discount expressly incorporated into the 2013 and 2014 Distributors Agreements (Garcia Decl. ¶ 13; Lomonosov Decl;¶ 7);
- the parties' contemporaneous written acknowledgment that the extra 5% was intended to cover ILS's past and future costs related to purchasing replacement parts and providing warranty services; (Garcia Decl. Ex. D-89, Ex. E-90);
- Illumina's contemporaneous statement that the addition of the extra 5% discount to the Distributors Agreement would "mean[] that there is no warranty coverage anymore" (*Id*. at Ex. D-89);
- the fact that ILS never once requested reimbursement for any warranty costs after striking the 5% deal (until this litigation) (Garcia Decl; ¶ 15; Lomonosov Decl. ¶ 7); and
- the fact that, when Illumina informed ILS it was not renewing the Distributors Agreement for 2015, ILS did not ask for reimbursement of any past warranty costs, but instead asked how it would be

"compensate[d]" for *future* warranty expenses given there would be "no more 5% discount" (Bates Decl. Ex. L-61).

ILS may claim that some or all of the above testimony and written communications is parol evidence that somehow should not be considered because the Distributors Agreement contains an integration clause. Specifically, section 18.10 states:

> This Agreement supersedes all prior communications, transactions, and understandings, whether oral or written, with respect to the subject matter hereof and constitutes the sole and entire agreement between the parties pertaining to the subject matter hereof. No modification, addition or deletion, or waiver of any of the terms and conditions of this Agreement shall be binding on either party unless made in a non-preprinted agreement clearly understood by both parties to be a modification or waiver, and signed by a duly authorized representative of each party.

Garcia Decl. Ex. G-128. Relying on such a "parol evidence" bar would be baseless for several reasons.

First, integration clauses like that in the Distributors Agreement only bar parol evidence that adds to, varies, or contradicts the terms of the fully-integrated agreement. Code Civ. Proc. § 1856, subd. (a); *Esbensen v. Userware Internat., Inc.*, 11 Cal.App.4th 631, 636 (1992) ("To the extent a contract is integrated, the parol evidence rule precludes the admission of evidence of the parties' prior or contemporaneous oral statements to contradict the terms of the writing…."). As noted, there is nothing in the Distributors Agreement stating that Illumina would reimburse ILS for paid orders of replacement parts (indeed, the agreement contemplates ILS ordering the parts free-of-charge and paying for all import costs). The only term related to who pays for ILS's orders is in Exhibit E to the agreement, which states that ILS would receive a 20% discount off all its general orders (which ILS received, even for its orders of replacement parts). Garcia Decl. Ex. G-136. The incorporated Terms & Conditions only state that the end-user ("Purchaser") will

receive replacement parts free-of-charge. *Id*. at Ex. B-55. Because there are no terms stating that Illumina will reimburse ILS for parts ILS chose to order and pay for out-of-pocket, the integration clause does not bar extrinsic evidence of the parties' agreement with respect to this issue.

Second, parol evidence "is always admissible to interpret" – rather than to modify – a fully-integrated agreement. *Ibid*; *Burch v. Premier Homes, LLC*, 199 Cal.App.4th 730, 742 (2011). In *Burch*, for example, the contract at issue had a nearly identical integration clause as here.[3] The parties there offered two competing interpretations on the scope of the arbitration agreement within the contract. As a matter of law, the court was permitted to consider extrinsic evidence – including "testimony as to the 'circumstances surrounding the making of the agreement ... including the object, nature and subject matter of the writing'" so that it could "place itself in the same situation in which the parties found themselves at the time of contracting" to decide whether the contract was "fairly susceptible of either one of the two interpretations contended for." *Id*. at 742 ("Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose."). Here, Illumina offers extrinsic evidence not to add or modify anything in the Distributors Agreement, but to demonstrate the parties' intent in creating the additional 5% discount term and to resolve the ambiguity about the cost of paid-for warranty replacements.

Third, an "integrated writing 'may be explained or supplemented by course of dealing or usage of trade or by course of performance.'" *Employers Reinsurance*

---

[3] Stating that the agreement's "terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement.... Neither this Agreement nor any provision in it may be extended, amended, or modified, altered or changed, except in writing [s]igned by Buyer and Seller." *Burch*, 199 Cal.App.4th at 741-42.

*Co. v. Superior Court*, 161 Cal.App.4th 906, 920 (2008), as modified (Apr. 22, 2008) *quoting* Code Civ. Proc. § 1856, subd. (c). Further, "not only is a course of performance relevant 'in ascertaining the meaning of the parties' agreement,' it may 'supplement or qualify the terms of the agreement,' or 'show a waiver or modification of any term inconsistent with the course of performance.'" *Employers Reinsurance Co.*, 161 Cal.App.4th at 920, *quoting* Cal. Com. Code § 1303, subd. (d), (f).[4] For the final two years of the parties' relationship, ILS paid for replacement parts and never once asked Illumina to reimburse it (because it was receiving a negotiated extra 5% discount that more than covered its replacement costs). Whether described as supplementing the agreement, explaining it, waiving rights thereunder, these are facts that doom ILS's ability to now claim a contractual right for reimbursement.

Given the overwhelming evidence ILS intended to pay for these replacements – shown by the contemporaneous statements by the parties and their undisputed course of performance – there certainly is at least a "reasonable possibility" Illumina will prevail on the contract claim.

**c. ILS Cannot Recover due to Waiver.**

Finally, setting aside issues of contractual interpretation, there is no question ILS received a 5% discount from Illumina in exchange for shouldering the cost of ordering replacement parts. Even were the Court or a factfinder to determine that

---

[4] "A 'course of performance' is a sequence of conduct between the parties to a particular transaction that exists if: (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

A 'course of dealing' is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Cal. Com. Code § 1303.

this somehow was not an express term of the Distributors Agreement, the evidence still demonstrates it took place. ILS therefore waived any right to reimbursement for replacement part orders.

Waiver (Illumina's sixth affirmative defense) occurs when a party makes "a clear expression…with a full knowledge of the facts and an intent to waive the right" on which it subsequently seeks to recover. *Spellman v. Dixon*, 256 Cal.App.2d 1, 5 (1967). The evidence shows ILS clearly expressed it would waive entitlement to past and future reimbursement for warranty orders in exchange for an extra 5% discount. Illumina thus has at least a "reasonable possibility" of showing ILS waived any contractual right to reimbursement for voluntarily incurring warranty costs in exchange for a benefit that exceeded its actual out-of-pocket expenses.

**2. Illumina Has a Reasonable Possibility of Defeating the Common Counts Claim.**

ILS's second cause of action for "common counts" is actually "not a specific cause of action," but rather a "simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness." *McBride v. Boughton*, 123 Cal.App.4th 379, 394 (2004). It is a generalized *quantum meruit* claim through which ILS contends Illumina owes it reimbursement for warranty replacement costs by virtue of *some* agreement, be it written, oral, express, or implied. *See* 4 Witkin, Cal. Proc. 5th (2008) Plead, § 407, p. 546. But, ultimately, it is an alternate claim based on the same facts as ILS's breach of contract cause of action, seeking recovery of the same alleged damages. *Clark v. Dulien Steel Products*, 54 Cal.App.2d 92, 96 (1942).

Illumina has at least a reasonable possibility of prevailing on ILS's common counts claim because of the same reasons it has a reasonable possibility of prevailing on the breach of contract claim. *See* Section III.B.1, *above*; *Farmers Ins. Exchange v. Zerin*, 53 Cal.App.4th 445, 459 (1997) (common counts claim fails

along with specific cause of action for which it is an alternate pleading).

**C. A Security in the Amount of $77,517.50 Is Appropriate.**

Given that Illumina has at least a reasonable possibility it will prevail on ILS's claims, ILS should be ordered to post a security sufficient to cover Illumina's reasonably anticipated recoverable costs. Cal. Code Civ. Proc. § 1030, subd. (b). These costs are summarized in the table below, and detailed more fully in the accompanying declaration by Illumina's counsel:

| **Item:** | **Total Amount:** | **Recoverable Under:** |
|---|---|---|
| Service of process (in Russia) | $4,030.00 | Local Rule 54.1(b)(1) |
| Trial transcripts | $3,832.50. | Local Rule 54.1(b)(2) |
| Deposition transcripts | $21,900.00 | Local Rule 54.1(b)(3)(a) |
| Deposition reporters and videographers | $11,800.00 | Local Rule 54.1(b)(3)(b)-(c) |
| Deposition interpreters | $9,450.00 | Local Rule 54.1(b)(3)(g) |
| Witness fees for depositions | $120.00 | Local Rule 54.1(b)(3)(f) |
| Witness fees for trial | $80.00 | Local Rule 54.1(b)(4)(a) |
| Witness travel and per diem for trial attendance | $2,612.00 | Local Rule 54.1(b)(4)(a) |
| Interpreter for trial | $1,590.00 | Local Rule 54.1(b)(4)(e) |
| Copies of translated documents for exhibits | $22,103.00 | Local Rule 54.1(b)(6) |
| **Total:** | **$77,517.50** | |

*See* Declaration of Matthew R. Jedreski ¶¶ 3-13. This conservatively estimated amount represents only a fraction of what ILS seeks to recover (listed in discovery responses as over $7 million). *Id*. at ¶ 14. Security requests are routinely granted for similar or greater amounts using the same methods of estimating costs. *See Kourtis*, 358 F. App'x at 866 (affirming $100,000 bond amount); *Pittman*, 525 F. App'x at 592-93 (affirming $240,000 bond amount reduced to $50,000 due to

individual plaintiff's inability to pay); *AF Holdings LLC v. Navasca*, 2013 WL 450383, at *4 (N.D. Cal. Feb. 5, 2013) (requiring bond of $50,000); *Gabriel Techs. Corp. v. Qualcomm Inc.*, 2010 WL 3718848, at *15 (S.D. Cal. Sept. 20, 2010) (ordering plaintiff post $800,000 bond).

## IV.

## CONCLUSION

For the foregoing reasons, Illumina respectfully requests an order requiring ILS to post, within 30 days, an undertaking of $77,517.50 with the Court to cover Illumina's reasonably anticipated recoverable costs.

Dated: March 23, 2016

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

By: */s/ Matthew R. Jedreski*

E. JOSEPH CONNAUGHTON
MATTHEW R. JEDRESKI
Attorneys for Defendant and Counter-Claimant ILLUMINA, INC.